UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LEONON JAMES ALSTON,

Petitioner,

v.

J. MACOMBER,

Respondent.

No. 2: 14-cv-1500 JAM KJN P

FINDINGS & RECOMMENDATIONS

I. Introduction

Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2012 conviction for first degree residential burglary with the victim present in violation of California Penal Code § 459. (Court Transcript ("CT") at 312.) Petitioner is serving a sentence of 19 years imprisonment. (Id.)

This action proceeds on the original petition. (ECF No. 1) Petitioner raises the following claims: 1) jury instruction error; 2) insufficient evidence; 3) evidentiary error; and 4) witness perjury.

After carefully considering the record, the undersigned recommends that the petition be denied.

////

////

1

II. <u>Standards for a Writ of Habeas Corpus</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result. <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. <u>Williams</u>, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

1    jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter,

2    131 S. Ct. 770, 786 (2011).

3        The court looks to the last reasoned state court decision as the basis for the state court

4    judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision,

5    "and the state court has denied relief, it may be presumed that the state court adjudicated the

6    claim on the merits in the absence of any indication or state-law procedural principles to the

7    contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing

8    that "there is reason to think some other explanation for the state court's decision is more likely."

9    Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

10       "When a state court rejects a federal claim without expressly addressing that claim, a

11   federal habeas court must presume that the federal claim was adjudicated on the merits – but that

12   presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

13   1088, 1096 (Feb. 20, 2013).  "When the evidence leads very clearly to the conclusion that a

14   federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de

15   novo review of the claim.  Id. at 1097.

16       Where the state court reaches a decision on the merits but provides no reasoning to

17   support its conclusion, the federal court conducts an independent review of the record.

18   "Independent review of the record is not de novo review of the constitutional issue, but rather, the

19   only method by which we can determine whether a silent state court decision is objectively

20   unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

21   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

22   basis for the state court to deny relief."  Harrington, 131 S. Ct. at 784.  "[A] habeas court must

23   determine what arguments or theories supported or, . . . could have supported, the state court's

24   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

25   arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at

26   786.

27   ////

28   ////

3

III.  Factual Background

The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein.

BACKGROUND

In the evening of June 6, 2011, Sandra Ortiz was in her living room when her two small dogs began barking. She looked out her window and saw defendant. Ortiz had seen defendant in the neighborhood a number of times and near the house twice before. Defendant was on a bicycle, stopped near her car, and was using a cell phone. He appeared to be looking in the window of her car and stayed there for a long time. As she watched, defendant approached the house next door. That house had been vacant for over a year, and frequently attracted transients. Ortiz changed vantage points and watched defendant from the bathroom window. She heard a loud noise and saw defendant scaling the fence into her yard.

Ortiz called 9–1–1. She watched defendant enter her backyard, approach a parked motorcycle in the yard, and go to her back door. She heard the doorknob turning, but the door did not open. She heard defendant forcibly remove the screen covering the bathroom window. She saw defendant put his fingers inside the window to push it open. The window had previously been nailed, so it could not be opened fully. After defendant opened the window a few inches, he put his whole arm inside to try to remove the nail and his face pressed up against the glass of the bathroom window. Ortiz reported to the 9–1–1 operator "He's coming in my house." Defendant did not get inside the house.

Police officers arrived at the scene approximately six minutes after receiving the 9–1–1 dispatch. They saw defendant standing in the backyard of Ortiz's home and ordered him not to move. Ortiz identified defendant as the prowler. She pointed out the screen that had been removed from the window. Ortiz told officers defendant had tried to stick his head through the window, but could not get into the house. She also indicated defendant had put both hands inside the window trying to feel around and push the window open further. Both on the night of the incident and a few months later, she told officers that defendant had ripped the screen off the bedroom window, but had not entered the home because the window was nailed shut. Ortiz maintained she told the officers defendant removed the screen from the bathroom window, not the bedroom window.

Ortiz told a defense investigator defendant did not put his head through the window. He had tried to put his head through, but could not because the window did not open fully. She also told the defense investigator defendant's hands were the only thing that crossed the threshold of the window and defendant never entered the house. Ortiz clarified that when she said defendant had not

4

entered the house, she meant his whole body did not physically come all the way inside the house.

The information charging defendant with first degree burglary (§ 459) alleged "defendant did unlawfully enter an inhabited dwelling house occupied by SANDY ORTIZ, with the intent to commit larceny and any felony."

The jury was instructed with CALCRIM No. 1700 that "[t]he defendant is charged in Count 1 with burglary in violation of Penal Code section 459.[¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant entered a building; [¶] AND [¶] 2. When he entered a building, he intended to commit theft." The jury was also instructed that "[t]he People do not have to prove that the defendant actually committed theft. Under the law of burglary, a person enters a building if some part of his or her body penetrates the area inside the building's outer boundary. A building's outer boundary includes the area inside a window screen."

The jury found defendant guilty as charged. In bifurcated proceedings, the trial court found three prior conviction allegations true. The trial court sentenced defendant to an aggregate term of 19 years in prison, imposed various fines and fees, and awarded 303 days of presentence custody credit.

People v. Alston, 2013 WL 4477055 at *1-2 (2013).

IV.  Discussion

A.  Claim 1:  Jury Instruction Error

In claim one, petitioner alleges that the trial court erred by failing to instruct as to attempted burglary and trespass.  The California Court of Appeal was the last state court to issue a reasoned decision addressing these claims.

*Trespass*

The California Court of Appeal rejected petitioner's claim challenging the trial court's failure to instruct on trespass for the reasons stated herein:

Defendant also contends the trial court should have instructed sua sponte on trespass. He admits trespass is not a lesser included offense under the elements test, but he argues the allegations in the information rendered trespass a lesser included offense under the accusatory pleading test.

Under the accusatory pleading test, we look to "whether the accusatory pleading describes the greater offense in language such that the offender, if guilty, must necessarily have also committed the lesser crime. [Citation.]" (People v. Moon, supra, 37 Cal.4th at pp. 25–26.) We do not consider the evidence adduced at trial.

5

(People v. Lohbauer (1981) 29 Cal.3d 364, 369–71.)

Residential burglary is the entry of a dwelling house with the intent to commit a felony. (§§ 459 & 460, subd (a).) Criminal trespass, also known as "unauthorized entry," is the entry of a residence without the owner's consent. (§ 602.5, subd. (a).) It is settled that trespass is not a lesser included offense of burglary under the elements test, because burglary may be committed by a person who has permission to enter a dwelling. (People v. Lohbauer, supra, 29 Cal.3d at p. 369.) Nonetheless, defendant contends the accusatory pleadings test is satisfied. He points to the language of the information, which alleged defendant "unlawfully" entered Ortiz's home. He says the nonconsensual entry required for trespass is necessarily included in the allegation that defendant committed an unlawful entry.

In a burglary, however, the entry is unlawful because it is committed with the intent to commit a felony. Here, the information alleged defendant "unlawfully" entered Ortiz's home "with the intent to commit larceny and any felony." It did not allege that defendant "unlawfully" entered Ortiz's home "without the owner's consent." The information alleges it was defendant's intent to steal that made his entry unlawful, not the owner's lack of consent. Accordingly, the information did not allege a trespass under the accusatory pleading test, and the trial court did not have a sua sponte duty to instruct on trespass.

People v. Alston, 2013 WL 4477055 at *3.

A lesser related offense is an offense with elements different from the charged offense but which bears a relationship to the charged offense. See Hopkins v. Reeves, 524 U.S. 88, 97 (1998). A lesser included offense is an offense whose elements are a subset of the elements of the charged offense. See United States v. Rivera -Alonzo, 584 F.3d 829, 832 (9th Cir. 2009). The California Court of Appeal's determination that trespass is a lesser related offense, rather than a lesser included offense, is binding on this court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (state court interpretation of state law binds a federal court in a habeas action).

The United States Supreme Court does not require that a criminal defendant receive a jury instruction on lesser related offenses. See Hopkins v. Reeves, 524 U.S. at 96–97. Accordingly, the trial court's refusal to read an instruction on trespass did not violate petitioner's constitutional rights. The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.

////

6

*Attempted Burglary*

The California Court of Appeal denied petitioner's claim challenging the trial court's

failure to give an attempted burglary instruction for the reasons stated herein:

> Defendant contends the trial court erred in failing to instruct sua sponte on the lesser included offense of attempted burglary.
>
> A trial court has a sua sponte obligation to instruct on lesser included offenses "'if the evidence "raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense."' [Citation.]" (<u>People v. Moon</u> (2005) 37 Cal.4th 1, 25.)
>
> "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) "In any criminal prosecution, 'The jury ... may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense.' (§ 1159.) Thus, where there is evidence that would absolve the defendant from guilt of the charged offense but would support a finding of guilt of attempt to commit the charged offense, an instruction on attempt is mandatory. [Citation.]" (<u>People v. Hamlin</u> (2009) 170 Cal.App.4th 1412, 1454.)
>
> Defendant argues the trial court should have instructed on attempted burglary because there was a "factual inconsistency as to the element of 'entry'.... The jury could have reasonably found that [defendant] intended to enter the residence and commit the burglary, but was not successful in entering the window."
>
> But to prove burglary, "it has long been settled that '[a]ny kind of entry, complete or partial, ... will' suffice. [Citations.] All that is needed is entry 'inside the premises' [citation], not entry inside some inner part of the premises." (<u>People v. Valencia</u> (2002) 28 Cal.4th 1, 13 (italics omitted) (<u>Valencia</u>)), <u>disapproved of on a different point</u> by <u>People v. Yarbrough</u> (2012) 54 Cal.4th 889, 894.) "It is settled that a sufficient entry is made to warrant a conviction of burglary when any part of the body of the intruder is inside the premises." (<u>People v. Failla</u> (1966) 64 Cal.2d 560, 569.) Putting a hand or fingers in an open window constitutes an entry for purposes of burglary. (<u>People v. Massey</u> (1961) 196 Cal.App.2d 230, 236.) Furthermore, "penetration into the area behind a window screen amounts to an entry of a building within the meaning of the burglary statute even when the window itself is closed and is not penetrated," because it violates both the occupant's possessory interest in the building and her personal interest in freedom from violence that might ensue from an unauthorized intrusion. (<u>Valencia</u>, <u>supra</u>, 28 Cal.4th at p. 13, fn. omitted.)
>
> Defendant's argument is based upon asserted inconsistencies in the statements made by Ortiz. Defendant says Ortiz (1) told officers defendant did not "enter" the home, but ripped the screen off the

7

bedroom window; (2) told the defense investigator only defendant's hands crossed the threshold of the window; (3) later told officers she saw defendant feeling around the window trying to push it in and to, unsuccessfully, stick his head in the window; and (4) testified at trial that defendant removed the screen from the bathroom window, put his whole arm inside the window and then on cross-examination testified he only put his fingers through the window, not his whole hand.

Even if Ortiz's testimony had some inconsistencies, they do not provide a basis on which defendant could be absolved of burglary. Even under defendant's version of Ortiz's statements, she described an actual entry into her home, not an attempt. In each statement, Ortiz indicated that either defendant's hands, fingers or arm entered through the window and in each statement she maintained he removed a window screen. There was no basis for the jury to find defendant did not successfully enter the home.

People v. Alston, 2013 WL 4477055 at *2-3.

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. Beck v. Alabama, 447 U.S. 625, 638, 638 (1980). The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases. The Ninth Circuit has declined to extend Beck to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case. See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (in non-capital case, failure of state court to instruct on lesser included offense does not alone present a federal constitutional question cognizable in a federal habeas corpus proceeding). Accordingly, petitioner's claim challenging the trial court's failure to sua sponte instruct the jury on the lesser included offense of attempted burglary does not raise a constitutional claim.

The Ninth Circuit has recognized that "the *refusal* by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established federal law. Solis, 219 F.3d at 929 (emphasis added). However, as indicated above, petitioner's counsel did not ask for an instruction regarding attempted burglary. Petitioner has not cited –and the court is unaware of – any authority for the proposition that it is a violation of due process for the trial court not to sua sponte instruct the jury on a lesser included offense. See Bradley v. Biter, 2014 WL 5660682, at *7 (C.D. Cal. Nov. 4, 2014) (finding no authority for proposition that a trial court's failure to sua

sponte instruct the jury on a lesser included offense violates a petitioner's due process rights).

For the reasons discussed above, the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.

B.  Claims 2, 3 4

In claim two, petitioner alleges that there was insufficient evidence to support his conviction.  In claim three, petitioner alleges that the trial court erred in permitting the prosecution to introduce into evidence, in the rebuttal, the gloves petitioner wore at the time of his arrest.  In claim four, petitioner alleges that eyewitness Ortiz committed perjury.

Respondent argues that claims 2, 3 and 4 are procedurally barred.

1.  Legal Standard

The procedural default doctrine forecloses federal review of a state prisoner's federal habeas claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule.  See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  Generally, "federal habeas relief will be unavailable when (1) 'a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds.'"  Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Coleman, 501 U.S. at 729-30).  A state procedural rule is "adequate" only if it is clear, consistently applied, and well established at the time of petitioner's default.  Walker, 562 U.S. at 316.  The respondent bears the burden of proof with respect to the "adequacy" of a state procedural bar.  Bennett v. Mueller, 322 F.3d 573, 585-86 (9th Cir. 2003). "[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989).

When a state prisoner has defaulted on his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

1    fundamental miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).

2        2.  Analysis:  Are Claims Defaulted?

3        Petitioner raised claims 2, 3 and 4 in state habeas petitions.  The Sacramento County

4    Superior Court issued a reasoned decision denying petitioner's habeas petition.  (Respondent's

5    Lodged Document 8.)  The California Court of Appeal and California Supreme Court denied

6    petitioner's state habeas petitions without comment or citation.  (Respondent's Lodged

7    Documents 10, 12.)  Accordingly, the undersigned "looks through" the unexplained denials by

8    the California Court of Appeal and California Supreme Court to the Superior Court's reasoned

9    denial on procedural grounds.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("[W]here, as

10   here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will

11   presume that a later decision rejecting the claim did not silently disregard that bar and consider

12   the merits.")

13       The Superior Court denied petitioner's state habeas petitions for the reasons stated herein:

14           Petitioner Leonon Alston filed this petition alleging that his 2011
             burglary conviction was the product of errors during trial.
15           Specifically, he contends that there was insufficient evidence to
             support his conviction, the court erred in allowing certain evidence
16           to be admitted, and that the victim provided false testimony.

17           A petition for writ of habeas corpus cannot serve as a second appeal
             or substitute appeal.  (In re Harris (1993) 5 Cal.4th 813, 829.)
18           Claims that could have been raised on appeal are not cognizable on
             habeas corpus unless the petitioner can show that (1) clear and
19           fundamental constitutional error strikes at the heart of the trial
             process; (2) the court lacked fundamental jurisdiction; (3) the court
20           acted in excess of jurisdiction not requiring a redetermination of
             facts; or (4) a change in law after the appeal affected the petition.
21           (In re Dixon (1953) 41 Cal.2d 756, 759; In re Harris, supra at p.
             828.)   In addition, habeas corpus is not available to review the
22           credibility of witnesses or to weigh the evidence supporting the
             judgment of conviction.  (Ex parte La Due (1911) 161 Cal.632,
23           635.)

24           Claims of insufficient evidence may generally be raised only on
             appeal.  Likewise, the court's decision to admit or exclude evidence
25           and issues related to trial testimony are part of the record, and thus
             could have been appealed.   As petitioner failed to raise these
26           arguments on appeal or show that they fall within one of the
             exceptions, they cannot be raised in this petition.
27

28   (Respondent's Lodged Document 8.)

1    The Superior Court found that petitioner's claims should have been raised on direct

2    appeal, citing In re Dixon.  Under In re Dixon, 41 Cal. 2d 756, 759 (1953), habeas corpus cannot

3    serve as a substitute for appeal and absent special circumstances, habeas relief is not available for

4    a claimed error that could have been, but was not raised on direct appeal.  The independence or

5    adequacy of California's Dixon rule has recently been addressed by the United States Supreme

6    Court.  In Johnson v. Lee, the Supreme Court determined California's Dixon bar is a "well-

7    established procedural bar that is adequate to bar to federal habeas review."  136 S. Ct. 1802,

8    1807 (2016).  Accordingly, petitioner's claims are procedurally barred unless he can establish

9    cause for the default and actual prejudice as a result of the alleged violation of federal law, or

10   demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

11   Coleman v. Thompson, 501 U.S. 722, 750 (1991).

12   To show "cause" for a procedural default under a traditional cause-and-prejudice analysis,

13   a petitioner must demonstrate that some objective factor external to the defense impeded his or

14   his counsel's efforts to comply with the state procedural rule at issue.  Coleman, 501 U.S. at 731.

15   Prejudice requires a finding of actual harm resulting from the alleged constitutional violation.

16   Thomas v. Lewis, 945 F.2d 1119, 1123 (9th Cir. 1991).

17       3. Cause

18   In the reply to the answer, petitioner argues that his state appellate counsel refused his

19   request to raise claims 2, 3 and 4 in his direct appeal.  Thus, petitioner argues, he failed to raise

20   these claims based on ineffective assistance of appellate counsel.

21   While ineffective assistance of counsel may constitute cause for procedural default, to

22   satisfy exhaustion principles, the ineffective assistance of counsel claim must be presented to the

23   state courts as an independent claim before it may be used to establish cause for procedural

24   default.  Murray v. Carrier, 477 U.S. 478, 488-89 (1986); see also Edwards v. Carpenter, 529 U.S.

25   446 (2000).   Petitioner did not give the state courts an opportunity to consider whether appellate

26   counsel was ineffective for not raising on direct appeal the issues now set forth as federal grounds

27   2, 3 and 4.  Accordingly, ineffective assistance of appellate counsel for failing to raise claims 2, 3

28   and 4 cannot serve as cause to overcome the procedural default of these grounds.

11

4. Prejudice—Claim 2

In claim 2, petitioner argues that to demonstrate burglary, the prosecutor had to prove that he intended to commit larceny.  Petitioner argues that the fact that he was wearing gloves was not sufficient to prove that he intended to steal from Ortiz.

California Penal Code § 459 defines burglary, in relevant part, as follows:  "Every person who enters any home … with intent to commit grand or petit larceny or any felony is guilty of burglary."  "Intent to steal is often proved by circumstantial evidence."  People v. Abilez , 41 Cal.4th 472, 508 (2007).

There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

The factual background, summarized by the California Court of Appeal, demonstrates that there was sufficient evidence that petitioner entered Ortiz's home with the intent to commit larceny.  Petitioner was wearing gloves in June, from which "the jury could reasonably infer he intended to avoid leaving fingerprints."  People v. MacClain, 2012 WL 5866549 at *3 (Cal. App. 2012).  In addition, petitioner's other actions were circumstantial evidence of intent to commit larceny.  Petitioner jumped over Ortiz's fence to enter her backyard rather than knocking on the front door.  Petitioner looked around at the car in the backyard and the shed.  When he could not open the backdoor, petitioner ripped the screen off the window.  From these actions, and the fact that petitioner was wearing gloves, a rational trier of fact could conclude that petitioner had the intent to commit larceny.  Accordingly, petitioner has not demonstrated prejudice with respect to this procedurally defaulted claim.

5. Prejudice—Claim 3

In claim 3, petitioner alleges that the trial court erred in permitting the prosecutor to admit into evidence, during her rebuttal, the gloves that he was found wearing.  Petitioner argues that these gloves should have only been admitted during the prosecutor's case-in-chief.

////

12

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986). Due process is violated only if there are "no permissible inferences the jury may draw from the evidence." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Even if an evidentiary error is of constitutional dimension, the court must consider whether the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 638 (1993); Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

During the prosecution's case-in-chief, prosecution witness Officer Hitchcock testified that when he made contact with petitioner after he was arrested, petitioner was wearing gloves. (RT at 268.) Officer Hitchcock testified that he thought it was odd for petitioner to be wearing gloves because it was June. (Id. at 273.) Therefore, the gloves supported the prosecution's theory, presented in the case-in-chief, that petitioner wore the gloves in order to facilitate larceny. Accordingly, the jury could draw a permissible inference from the gloves.

Pursuant to the case law cited above, petitioner's claim alleging that the trial court improperly allowed admission of the gloves during the prosecution's rebuttal does not state a cognizable federal claim. For this reason, petitioner has not demonstrated prejudice with respect to this procedurally defaulted claim.

6. Prejudice—Claim 4

In claim 4, petitioner argues that victim Ortiz committed perjury. "[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976) (footnotes omitted). The essential elements of such successful claim are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured,

1    and (3) the false testimony was material.  Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (en

2    banc); see Napue v. Illinois, 360 U.S. 264, 269 (1959); Murtishaw v. Woodford, 255 F.3d 926,

3    959 (9th Cir. 2001).

4         A witness testifying under oath commits perjury if she "gives false testimony concerning a

5    material matter with the willful intent to provide false testimony, rather than as a result of

6    confusion, mistake, or faulty memory."  United States v. Dunnigan, 507 U.S. 87, 94 (1993).  Not

7    every discrepancy in testimony translates into perjury.  Lambert v. Blackwell, 387 F.3d 210, 249

8    (3d Cir. 2004).  Falsity is not established merely by showing that the witness made an earlier

9    inconsistent statement, or that the witness's testimony differs from that of another witness.  See

10   United States v. Zuno–Arce, 44 F.3d 1420, 1423 (9th Cir. 1995).  "Discrepancies in testimony

11   …could as easily flow from errors in recollection as from lies."  Id.

12        Petitioner argues that Ortiz's conflicting statements demonstrate that she committed

13   perjury.  In the reply to the answer, petitioner cites nine examples of alleged perjury:  1) the photo

14   and the sun; 2) "don't remember every detail"; 3) "I didn't see/did"; 4) prior contact with

15   appellant; 5) dogs; 6) gloves; 7) "he saw me" comment; 8) brother; 9) bedroom

16   window/bathroom window.

17        For the reasons discussed herein, the undersigned does not find that Ortiz committed

18   perjury.

19        *The Photo and the Sun*

20        Petitioner argues that Ortiz testified falsely regarding her inability to photograph

21   petitioner.  (ECF No. 32 at 29.)  Ortiz testified that she went to her bathroom to watch petitioner

22   because she wanted to take a picture of him and observe how he was able to get into the vacant

23   house next door.  (RT at 103.)  Ortiz testified that she was unable to take the picture because the

24   sun was too bright.  (Id. at 104.)  The responding officers were dispatched to the scene at 8:11

25   p.m. and arrived at 8:16 p.m.  (RT at 575.)  Petitioner argues that based on when the officers were

26   dispatched, Ortiz must have been watching him around 8:00 p.m.  (ECF No. 32 at 29.)  Petitioner

27   argues that on most days, the sun usually sets by 8:00 p.m.  (Id.)  Petitioner argues that Ortiz's

28   testimony that the sun was too bright to photograph him was false because the sun had set by 8:00

p.m.

Sacramento Police Officer Wiseman testified that when he arrived on the scene at 8:15 p.m. it was light outside.  (RT at 575-76.)  Officer Wiseman testified, "It was earlier than dusk.  I couldn't tell you how light it was."  (Id. at 576.)  Based on this testimony, and considering that the incident occurred in June, the undersigned finds that petitioner has not demonstrated that Ortiz testified falsely regarding her inability to photograph petitioner due to bright sun.

*Don't Remember Every Detail*

Petitioner next argues that Ortiz testified falsely regarding her memory of the incident.  (ECF No. 32 at 30.)  Citing page 129 of the reporter's transcript, petitioner argues that Ortiz testified that she did not remember every detail of what happened.  (Id.)  Citing page 130 of the reporter's transcript, petitioner argues that Ortiz testified that she did remember every detail of the incident.  (Id.)

After reviewing the pages of the transcript cited by petitioner, it appears that petitioner is referring to the following testimony:

> Q:  Now, do you remember advising the police officers on the day of the event that he had –that you didn't think this person ever entered your home?
>
> A:  Right, I did tell them that he tried to get in, and I did tell them that he tried to stick his head through but the window wasn't high enough.
>
> Q:  So you said he definitely tried to push the window up, right?
>
> A:  Right.
>
> Q:  But that he couldn't get into the house?
>
> A:  He couldn't get in.  The window wasn't high enough.
>
> Q:  Okay.  And in the 911 call, do you recall telling the 911 operator that he's –he came in my house by the bathroom?
>
> A:  I don't recall saying he came in the house.  I said he's at the bathroom window, trying to break in.
>
> Q:  Okay.  And do you recall telling the 911 operator that he went through the house to get in the bathroom?
>
> A:  The police went through the house to get – to go through the back to get him outside the bathroom window.

1

Q:  Okay.  So when you're telling the 911 operator that he went through the house to get in the bathroom and the guy left, that – you're talking about the police officer that was there who went through your home that night, that day?

2

3

A:  *I don't remember.  I'm not quite –I was – I don't recall every little detail of what happened, because it—I don't recall.*

4

5

Q:  So is it fair to say that you're testifying based on your memory today?

6

A:  No, I can –this is—this isn't a memory.  This is a nightmare. I can't even sleep at night.  Okay?  I did not even leave.  *I remember every little detail.*

7

8

Defense counsel: Objection.  Nonresponsive.

9

Court: Sustained just at this point.  Next question.

10

Q:  *All right.  Ma'am, today, are you basing your testimony on what you remembered of the event of June 6?*

11

12

A:  *Yes.*

13

14

(Id. at 129-30 (emphasis added).)

15

     The testimony quoted above does not demonstrate that Ortiz committed perjury.  When

16

Ortiz testified that she could not remember every detail of what happened, it appears that she was

17

referring to what she said to the 911 operator.  Moreover, this statement was made after a series

18

of confusing questions from defense counsel.  When Ortiz testified that she could remember the

19

details of what happened, it appears that she was referring to her observations of petitioner.  The

20

testimony quoted above does not demonstrate a willful intent to testify falsely.  See  United States

21

v. Dunnigan, 507 U.S. 87, 94 (1993) (confusion, mistake, faulty memory do not amount to

22

perjury.)  Moreover, inconsistencies in witness testimony are for the jury to resolve, and do not

23

establish that a witness committed perjury or that the prosecutor knowingly introduced false

24

testimony.  United States v. Geston, 299 F.3d 1130, 1135 (9th Cir. 2002).

25

     *"I didn't see/did"*

26

     Petitioner argues that Ortiz testified inconsistently regarding seeing petitioner remove the

27

window screen and put his hands in the window.  Citing reporter's transcript pages 115-16,

28

petitioner argues that Ortiz first testified that she did *not* see petitioner try to enter her house, but

16

1  then testified that she did see petitioner try to enter the house.

2         In relevant part, Ortiz testified:

3         Q:  You said that you saw the man press his face up against the
          window.
4
          A:  No, he had already torn the screen off.
5
          Q:  Did you see him do that?
6
7         A:  I only seen the last part of it when it got stuck on the very top
          right here.  This part here was stuck up here, and he finally ripped it
8         off, and that's what he did.

9         Q:  And the screen – when you say the screen, did he damage the
          screen when he ripped it off?
10
          A:  It was already damaged.  There was a little hole in it already.
11
          Q:  Okay.  And what did you observe the man do next?
12
          A:  I ran.  I didn't observe any more.
13
          Q:  Okay.  Do you recall telling the officer, "He's coming" – you
14        heard on the 911 call – "He's coming in my house.  He's coming in
          my house"?
15
          A:  Yeah.
16
          Q:  Did you actually see him trying to come inside your house?
17
          A:  Yes, he did.  He couldn't put his head through – he didn't lift it
18        high enough –because there was a nail there.

19        ****

20        Q:  Okay.  And when the man started – he ripped off the screen,
          you say he started to try to come into the house; is that right?
21
          A:  Right.
22
          Q:  Did he raise the –
23
          A:  He only raised it about a good four inches, maybe.
24
          Q:  Okay.
25
          A:  -- then it was already.  So it was all the way up to about six
26        inches, maybe.

27        Q:  Did the man actually stick his hands inside the window in order
          --
28
          A:  Yes.

1        Defense Counsel:  Objection.  Foundation.

2        Court:  I'm going to sustain.

3        Defense Counsel:  Move to strike.

4        Court:  It is stricken by the ruling.

5        Q:  Did you see the man stick his hands in and raise the window?

6        A:  Right. I seen his whole arms trying to reach for the nail.

7   (RT at 115-17.)

8        Petitioner appears to argue that in the testimony quoted above, Ortiz testified that she ran

9   away after seeing petitioner pull off the screen, but later testified that she saw petitioner reach his

10  hand in the window and try to remove the nail.  Petitioner argues that if Ortiz ran away after he

11  removed the screen, she could not have seen him reaching his hand in the window.  Petitioner

12  also argues that on the 911 tape, Ortiz is heard saying, "Wait, wait.  I think I hear him coming

13  into my house."  (ECF No. 32 at 30.)  Petitioner argues that it is reasonable to infer from Ortiz's

14  statement in the 911 call that she thought petitioner was coming into her house, but that she did

15  not actually see him put his hands inside the window.

16       The testimony quoted above is somewhat confusing regarding the timing of Ortiz's

17  observations of petitioner ripping off the screen, putting his fingers in the window and when Ortiz

18  ran away.  However, this testimony does not amount to perjury.  See United States v. Dunnigan,

19  507 U.S. 87, 94 (1993) (confusion, mistake, faulty memory do not amount to perjury); Geston,

20  299 F.3d at 1135 (inconsistencies in testimony are for the jury to resolve, and do not establish that

21  a witness committed perjury).

22       The undersigned observes that Ortiz later testified on cross- examination in greater detail

23  regarding her observations.  She testified that she saw petitioner put his fingers inside the

24  window, and then she ran away.  (RT at 162-65.)  On re-direct examination, Ortiz also testified

25  that she "took off running" when she saw petitioner put his fingers in the window and start raising

26  the window up.  (Id. at 202.)   This later testimony helped to clarify the confusing testimony

27  quoted above.

28  ////

In addition, contrary to what petitioner claims, the transcript from the 911 call indicates that Ortiz affirmatively told the 911 operator that petitioner was coming into her house:

> Ortiz:  Oh my God, what if he tries to come into the window…
>
> 911 Operator: Well…
>
> Ortiz:  I think they're all locked though I think …I'm pretty sure they're all nailed down.
>
> 911 Operator:   Okay, well keep an eye … (inaudible) (both speaking at once).
>
> Ortiz:  (Whispering) Oh my, wait, wait I think I hear him coming in and this is the back.
>
> 911 Operator:  Through the bathroom?
>
> Ortiz:  Yeah, because of the window practically you can open it but you really can't because I have a little … (gasps) *Oh my God, he's trying to, he's coming in my house!  He's coming in my house!*

(ECF No. 32 at 52 (emphasis added.))

While it is not entirely clear from the transcript quoted above what Ortiz witnessed, she clearly told the 911 operator that petitioner was coming into her house.

*Prior Contact*

Petitioner next argues that Ortiz committed perjury when she testified inconsistently regarding whether petitioner had acknowledged her during her prior sightings of him.  (ECF No. 32 at 31.)  Petitioner cites Ortiz's testimony that during the week prior to the incident, she saw petitioner riding his bike around.  (RT at 125.)  Ortiz looked at petitioner, but "I don't know if he realized it."  (Id.)  Citing page 172 of the reporter's transcript, petitioner argues that Ortiz later testified that petitioner acknowledged her going into her house.

Ortiz later clarified that she saw petitioner on two different occasions prior to June 6, 2011.  (RT at 204-05.)  In the testimony cited by petitioner, Ortiz appears to be describing two different incidents.  The testimony cited by petitioner does not constitute perjury.

Petitioner also claims that Ortiz testified falsely regarding seeing petitioner in the vacant house next door.  Petitioner cites the following testimony:

> Q:  And at any time had you seen him over at the abandoned house

19

next door to yours?

A:  He's been there a couple of times with other people.

Q:  With other people?

A:  Right.

Q:  And the other people, are they African American, black?

A:  I don't know.  It was nighttime.  I didn't keep looking.  It was nighttime, and I just shut the window.

(RT at 153.)

Petitioner argues that if Ortiz was unable to determine if the other people with petitioner were African American because it was night, then how was she able to identify petitioner, who is also African American?  While petitioner may have a point, this testimony was not material.  See Hayes v. Brown, 399 F.3d 972, 984-85 (9th Cir. 2005) (to succeed on a claim alleging that the state knowingly used false evidence, petitioner must demonstrate that the evidence was material; materiality is determined by whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury.").  Assuming Ortiz testified falsely regarding seeing petitioner previously at the vacant house at night, there is no reasonable likelihood that this testimony could have affected the judgment of the jury.

Petitioner also argues that Ortiz testified inconsistently regarding whether she had seen petitioner on her property before June 6, 2011.  (ECF No. 32 at 31-32.)  Petitioner cites the following portion of the transcript from the 911 tape:

911 Operator:  Okay.  You don't have to if you don't want to.  You've seen him in your yard before?

A:  No, I,--I—I never really paid attention because when they stay next door, I never think they'd come to my house, you know.

(Id. at 50.)

At trial, Ortiz testified that she had seen one person on her property before, although it is not clear whether she meant petitioner:

Q:  So the other time when the other people were there with this person, you didn't run through your house and call 911 and seek to take photos on that date?

20

A:  I didn't do that because they had gone on my property thinking that's where he was –that they were at, because they were yelling somebody's name out, and that's the only reason I got up and looked again.

Q:  Okay. So on that particular time, they were on your property also?

A: Right.

***

Q:  Okay.  So the people with –the person you saw ride the bike was over at the abandoned house with other people. They were on your property on a specific date?

A:  One person only was on my property. The rest were next door.

(RT at 154-55.)

It is not clear from either the 911 tape or the testimony quoted above whether Ortiz saw petitioner on her property prior to June 6, 2011.  In any event, Ortiz's testimony quoted above is not perjury because, at most, this testimony is inconsistent with her statement on the 911 tape. Geston, 299 F.3d at 1135 (inconsistencies in testimony are for the jury to resolve, and do not establish that a witness committed perjury).

*Dogs*

Petitioner alleges that on the 911 tape, Ortiz is heard consoling a dog.  (ECF No. 32 at 51 (transcript from 911 tape).)  Shortly after this, Ortiz told the 911 operator that petitioner was trying to get into her house.  (Id. at 52.)  Petitioner alleges that there is no barking heard on the 911 tape.  (Id. at 32.)  The trial transcript supports this claim.  (RT at 193.)  Petitioner argues that the lack of barking on the 911 tape suggests that Ortiz did not see petitioner trying to open the window.  (ECF No. 32 at 32.)  Petitioner argues that if Ortiz's dogs were with her when she allegedly saw him opening the window, they would have barked.  (Id.)

Ortiz testified that one of her dogs barks when it hears someone outside.  (RT at 156.) However, Ortiz testified that she held on to that dog's "snozzle" to keep her from barking during the incident.  (Id.)  The undersigned also observes that Ortiz later testified that,

She was barking the whole entire time until he was in the bathroom window, when I picked her up, covered her snozzle and ran into my bedroom, threw her on the bed.  I really just threw her and went

21

back to where I was at, because the dispatch was talking to me, asking me, "What is he doing now?"

(Id. at 184.)

Ortiz was later asked if she could explain why her dog could not be heard barking during the 911 tape. (Id. at 193.) Ortiz responded,

> A:  The only thing I can think of is the last part of it was when I threw her in the bedroom.  As far as before that, why she didn't get on the tape, I don't know, because she was barking.  She was in the kitchen when the whole incident was –started.
>
> And then she did see him, and she started to run over.  That's why I grabbed his [sic] nose, whatever, snozzle and ran to the bedroom, threw her in there, shut the door, and ran back into the kitchen.
>
> Q:  As you sit here today, you remember your dog barking; is that correct?
>
> A:  Yeah, she was barking.  I don't know why it's not on the thing.

(Id.)

Ortiz's testimony regarding her dog barking and speculation regarding why it could not be heard on the 911 tape does not constitute perjury.  Ortiz offered a reasonable explanation regarding why her dog could not be heard.  Even assuming Ortiz's dog was not barking, the record does not suggest that Ortiz intended to testify falsely.  See United States v. Dunnigan, 507 U.S. 87, 94 (1993) (confusion, mistake, faulty memory do not amount to perjury.)  For these reasons, the undersigned does not find that Ortiz's testimony regarding her dog barking during the incident constituted perjury.

*Gloves*

Petitioner argues that Ortiz made inconsistent statements regarding whether he was wearing gloves.  Petitioner cites a report by Sacramento Police Officer Lopez containing a statement he took from Ortiz on August 27, 2011.  (ECF No. 32 at 72.)  In this statement, Ortiz stated, "I don't ever remember him wearing gloves.  I was focusing on his face the entire time."  (Id.)  In contrast, Ortiz testified that petitioner was wearing gloves.  (RT at 163.)

Ortiz's trial testimony that petitioner wore gloves is puzzling based on her statement to Officer Lopez that she did not remember petitioner wearing gloves.  However, these inconsistent

1  statements do not establish perjury.  Geston, 299 F.3d at 1135 (inconsistencies in testimony are

2  for the jury to resolve, and do not establish that a witness committed perjury).

3       Moreover, to succeed on a claim alleging that the state knowingly used false evidence,

4  petitioner must demonstrate that the evidence was material.  Hayes v. Brown, 399 F.3d at 984-85.

5  Even if Ortiz testified falsely that petitioner wore gloves, as discussed above, the prosecutor

6  presented other evidence that petitioner wore gloves during the June 6, 2011 incident.  Assuming

7  Ortiz's testimony that petitioner wore gloves was false, there is no reasonable likelihood that this

8  false testimony affected the judgment of the jury because of the other credible evidence that

9  petitioner was wearing gloves.

10       *"He saw me" Comment*

11       Petitioner argues that in the transcript of the 911 call, Ortiz told the operator that petitioner

12  was standing in her backyard next to the moped when he saw her.  (ECF No. 32 at 34, 51

13  (transcript of 911 call).)  Petitioner argues that at trial, Ortiz testified that petitioner was at the

14  backdoor when he saw her.  (RT at 113.)  Petitioner argues that the space between the backdoor

15  and the moped is "great enough to constitute two conflicting storylines."  (ECF No. 32 at 34.)

16       Ortiz testified that when she told the dispatcher that petitioner saw her, petitioner was

17  approaching the backdoor.  (RT at 113.)  The transcript of the 911 tape states, in relevant part,

18
19      Ortiz:  He's on the side now and there's a –a moped but the moped
doesn't work.  You know another thing that I think he took one of
my tables in the back because I see it next door.

20      911 Operator:  Oh dear.

21      Ortiz:  Not that it's—yep, he seen me.  He seen me.

22  (ECF No. 32 at 51.)

23       Ortiz's testimony that petitioner was approaching the backdoor when he saw her is not

24  clearly inconsistent with her statement to the 911 operator.   Even assuming Ortiz made

25  inconsistent statements, her allegedly inconsistent trial testimony regarding when petitioner saw

26  her does not constitute perjury.  See United States v. Dunnigan, 507 U.S. at 94 (confusion,

27  mistake, faulty memory do not amount to perjury); Geston, 299 F.3d at 1135 (inconsistencies in

28  testimony are for jury to resolve, and do not establish that a witness committed perjury).

23

1    Moreover, this testimony is not material.  <u>Hayes v. Brown</u>, 399 F.3d 972, 984 (9th Cir. 2005)

2    (materiality is determined by whether there is "any reasonable likelihood that the false testimony

3    could have affected the judgment of the jury.").

4              *Brother*

5              Petitioner argues that Ortiz made inconsistent statements regarding her brother's

6    whereabouts.  (ECF No. 32 at 34.)  Petitioner argues that she told the 911 operator that her

7    brother was staying at someone's house for one week.  (<u>Id.</u>)  Petitioner argues that at trial, Ortiz's

8    testimony suggested that her brother was living at the house with her at the time of the incident.

9    (<u>Id.</u> at 34.)

10             For the following reasons, Ortiz's testimony regarding her brother's whereabouts did not

11   constitute perjury.  The transcript from the 911 call indicates that Ortiz stated that her brother

12   lived at the house with her, but was staying at somebody's house for three weeks.  (<u>Id.</u> at 50.)  At

13   trial, Ortiz clarified that during the week prior to and after June 6, 2011, her brother was at her

14   house off and on.  (<u>Id.</u>)

15             He [Ortiz's brother] was living there, yes, but he was – like I said, it
               was in –he lived in –the person that sold the house lived around
16             Citrus Heights/Fair Oaks area.  So he would go, and he was selling
               the person – his boss-- really, it was his boss at one time's trucks.
17
               So he would come and go, but in the nighttime, most of the –the
18             majority of the time, by nine, ten o'clock, he wasn't there for those
               off-and-on weeks.
19

20   (<u>Id.</u> at 138.)

21             According to Ortiz, her brother was at home with her off-and-on during the week before

22   the incident, because he was taking care of someone else's property.  Thus, her statements to the

23   911 operator and her trial testimony regarding her brother's whereabouts were not inconsistent.

24             *Bedroom/Bathroom Window*

25             Petitioner argues that Ortiz made inconsistent statements regarding whether petitioner

26   tried to enter her bedroom window versus her bathroom window.  (ECF No. 32 at 34.)  Ortiz told

27   the 911 operator that petitioner was entering through the bathroom window.  (<u>Id.</u> at 52.)

28   Petitioner cites the report by Officer Lopez, which states that Ortiz told him that petitioner tried to

1    enter her bedroom window.  (Id. at 74.)  Petitioner argues that Ortiz told the defense investigator

2    that petitioner tried to enter the bedroom window.  (Id. at 34.)  However, the defense

3    investigator's report indicates that Ortiz stated that petitioner tried to enter her bathroom

4    window.[1]  (Id. at 68-69.)

5         For the following reasons, the undersigned finds that Ortiz's testimony that petitioner tried

6    to enter her bathroom window did not constitute perjury.  Ortiz testified that petitioner tried to

7    break into the bathroom window.  (RT at 114-118.)  On cross-examination, Ortiz testified that

8    Officer Lopez incorrectly recorded in his report that Ortiz told him that petitioner tried to break

9    into her bedroom window.  (Id. at 160.)  Ortiz testified that her bedroom windows did not have

10    screens, like her bathroom window.  (Id.)  Ortiz testified that she told Officer Lopez that

11    petitioner tried to break into a bathroom window.  (Id. at 161.)

12         Ortiz was shown a photograph, marked as People's Exhibit 28.  (Id. at 123.)  Ortiz

13    testified that the photograph showed the window that petitioner tried to enter.  (Id.)  Officer

14

---

15    [1]   The defense investigator's report states, in relevant part,

16           After (Alston) found that my back door was locked, I saw him walk
          over toward the side of the house.  My bathroom has a window
17           looking out to the side of the house that (Alston) walked to, so I ran
          in there really quick and looked out to see what he was doing.  At
18           first, he was checking out my moped that I have parked back there.
          Then, he approached the bathroom window.  I ran out of the
19           bathroom and entered the kitchen.

20           The kitchen is on the other side of the back porch, which is attached
          to the bathroom. So from the kitchen, you can't see the bathroom
21           unless you poke your head out into the porch area.  That's what I
          did. I didn't want (Alsto) seeing me, and I was scared, so I was sort
22           of hiding in the kitchen while poking my head out to see what he
          was doing.  I had a clear view of the bathroom window (Alston)
23           had approached.  I'm not good at distance, so I couldn't say how far
          away I was from the window, but I know what I saw. He
24           approached the window and tried to get inside.  First he ripped off
          the screen.  Then, he tried squeezing his head in through the
25           window.

26           My bathroom window only opens about half-way, so (Alston)
          wasn't able to squeeze his head through.  I saw him reach his hands
27           in to see what was blocking the window from opening all the way,
          but he wasn't able to open it any further.
28    (ECF No. 32 at 68-69.)

1  Hitchcock identified People's Exhibit 28 as a photograph showing the window he had been

2  advised that petitioner had tried to enter.  (Id. at 293.)  Therefore, Officer Hitchcock identified the

3  bathroom window as the window petitioner tried to break in to.

4      While Officer Lopez's report states that Ortiz reported that petitioner tried to break into a

5  bedroom window, as opposed to the bathroom window, it is fairly clear from the record that this

6  was a mistake.  All other evidence and statements by Ortiz indicated that she reported petitioner

7  trying to break into her bathroom window.  Based on this record, the undersigned does not find

8  that Ortiz committed perjury when she testified that petitioner tried to break into her bathroom

9  window.

10      *Conclusion—Prejudice Regarding Claim 3*

11      For the reasons discussed above, the undersigned finds that petitioner has not

12  demonstrated that Ortiz committed perjury.  While Ortiz's testimony was, at times, confusing and

13  inconsistent, it did not amount to perjury.

14      The undersigned observes that in the reply, petitioner further argues that the jury

15  suspected that Ortiz may have perjured herself.  (ECF No. 32 at 28.)  Petitioner argues that during

16  deliberations, the jury submitted the following question:

17
18          Is it possible that the District Attorney educated Sandra Ortiz on the law regarding first degree residential burglary before her testimony to the jury?  If so, did she?

19  (CT at 186.)

20      The trial court responded to this question as follows:

21
22
23
24          In response to Question No. 2:  The evidence phase of the trial is over; therefore, no additional evidence can be presented to the jury.  The only evidence in the record regarding communications between the District Attorney and Sandra Ortiz is in the testimony of Ms. Ortiz.  Please advise the Court if you want any portion or all of Ms. Ortiz's testimony read back to the jury.

25  (Id. at 187.)

26      The jury's question suggests that it had some question regarding whether Ortiz had been

27  coached on the law regarding first degree residential burglary.  However, the undersigned finds

28  no evidence that Ortiz gave "false testimony concerning a material matter with the willful intent

1  to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."

2  United States v. Dunnigan, 507 U.S. at 94.  Instead, the consistencies in Ortiz's testimony were

3  for the jury to resolve, and did not establish that she committed perjury, or that the prosecutor

4  knowingly used false testimony.  Geston, 299 F.3d at 1135.  Accordingly, petitioner has not

5  demonstrated prejudice with respect to this procedurally defaulted claim.

6      *Miscarriage of Justice*

7      Finally, the undersigned finds that petitioner has not demonstrated that failure to consider

8  defaulted claims 2, 3, and 4 will result in a fundamental miscarriage of justice.  Coleman v.

9  Thompson, 501 U.S. 722, 750 (1991).

10     Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

11  habeas corpus be denied.

12     These findings and recommendations are submitted to the United States District Judge

13  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

14  after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

17  he shall also address whether a certificate of appealability should issue and, if so, why and as to

18  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

19  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

20  2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after

21  service of the objections.  The parties are advised that failure to file objections within the

22  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

23  F.2d 1153 (9th Cir. 1991).

24  Dated:  October 13, 2016

25

26  AI1500.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

27

28

27